JAMES J. PRYOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Pryor v. Commissioner
Docket No. 12820-84
United States Tax Court
T.C. Memo 1987-80; 1987 Tax Ct. Memo LEXIS 76; 53 T.C.M. (CCH) 100; T.C.M. (RIA) 87080; February 10, 1987. James J. Pryor, pro se. Bonnie L. Cameron, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the calendar year 1980 in the amount of $1,524. Prior to the issuance of the notice of deficiency petitioner claimed a deduction in 1980 for a casualty loss of $17,750 which was rejected in the notice of deficiency. Due to concessions by *77 petitioner, the only issue for decision is whether petitioner is entitled to all or any part of the claimed casualty loss deduction in 1980. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner resided in Augusta, Georgia at the time he filed his petition with the Court. Petitioner and his wife, Iris H. Pryor, filed a joint Federal income tax return for the taxable year 1980 with the Internal Revenue Service Center in Atlanta, Georgia. During the year here in issue and for some prior thereto, petitioner was a dentist practicing in Augusta, Georgia. On September 26, 1957, petitioner purchased a house and lot in Augusta, Georgia for $28,500. Because the lot on which petitioner's house was located slanted towards the house, petitioner had a French drain installed on the lot at a cost of $3,000 shortly after he purchased the house. The drain was installed to prevent water damage under the house. The drain kept the area under petitioner's house completely dry for the next 18 years. During the taxable years 1975 and 1976, petitioner's residence was insured by State Farm Insurance Company. Since at least 1962, the City of Augusta *78 (city) has experienced problems with Rae's Creek which ran some 200 yards behind petitioner's house. The creek flowed from the Augusta National Golf Course and into Lake Olmstead. Some time prior to March 1975 the city found it necessary to dredge the excess sand from Rae's Creek. In 1974 or early 1975, the city filled in the low area behind petitioner's property to build a roadway to accommodate the dredging equipment which was used to dredge Rae's Creek. Petitioner was aware that dirt for this purpose was being hauled onto the property behind his house. In early 1975 petitioner discovered water standing under his house. Upon investigation, petitioner determined that the city had covered up the exit for the French drain which resulted in the drain not carrying off water from under his house. Petitioner reported the problem to the Augusta city engineer who sent someone out to inspect the area under petitioner's house. The city engineer agreed with petitioner that the city had caused the water problem under his house and told petitioner that the city would correct the problem. On October 28, 1976, approximately 2 years after covering the drain, the city council adopted *79 a motion providing for the city to repair petitioner's French drain which had been damaged during the dredging of Rae's Creek causing water to stand under petitioner's house. In November 1976, the city had the drain uncovered and extended. Damage to petitioner's house occurred during the 2-year period that water stood beneath it. In the spring of 1976, termites swarmed from three areas and a subsequent investigation revealed extensive damage. The plywood in the roof was saturated by moisture from the standing water which caused it to delaminate and warp. The water also caused wood decay to the supporting timber and mold and mildew damage to the house and its contents. Between 1977 and 1979 the area beneath petitioner's house was dry and no further damage resulted from the 1974 covering of the drain. Petitioner did not file a claim for the damage to his house with the city, his insurance company, or anyone else. Petitioner was aware in the latter part of 1979 that the city was again working on Rae's Creek. The city added some 2 feet of fill dirt to the city property directly behind petitioner's property. In early 1980 petitioner again discovered water standing under his *80 house. Petitioner determined that the city had for the second time covered up the now-extended French drain. Petitioner wrote the city engineer about his problem. The city engineer agreed to extend the drain but rather than wait for the city to get around to doing the work, petitioner uncovered and extended the drain himself. Petitioner requested the city to reimburse him for his expenses of approximately $400. When he received no response to his letter, petitioner decided to forego attempting to recover from the city and instead to claim a casualty loss deduction in computing his Federal income tax for 1980. Once the drain was again extended into Rae's Creek, the area under the house dried out. The house incurred some damage after the drain was covered for the second time; however, the exact amount cannot be determined. No termite damage occurred the second time. The only known damage from the second incursion of water under petitioner's house was a further dampening of the plywood in the roof. No repairs were made to petitioner's house for the termite or water damage. The only repair made prior to trial from either incursion of water was uncovering and extending the *81 drain. Most of the approximately $400 expended by petitioner in June of 1980 was for extending the drain into Rae's Creek rather than for uncovering the drain. In 1980 the Richmond County, Georgia Tax Assessors office revalued all the property in the county for property tax purposes. Petitioner's house was revalued from a $60,000 1979 value to a proposed value of $70,790. Petitioner requested that the Board of Tax Assessors have someone visit his property to inspect the termite and water damage. Subsequent to this inspection a recommendation was made that petitioner's house be valued at $53,040. On February 15, 1984, respondent issued a statutory notice of deficiency to James J. and Iris H. Pryor, increasing petitioner's taxable income for 1980 and disallowing the claimed casualty loss deduction. OPINION Section 165(a)[1] allows a deduction for losses sustained during the taxable year which are not compensated for by insurance or otherwise. Section 165(c) provides that in the case of individuals deductible losses are limited to losses incurred in a trade or business or a transaction *82 entered into for profit and losses of property not connected with a trade or business or transactions entered into for profit resulting from "fire, storm, shipwreck, or other casualty, or from theft." Petitioner claims a loss deduction attributable to an "other casualty." An "other casualty" has been held to occur -- whenever unexpected, accidental force is exerted on property and the taxpayer is powerless to prevent application of the force because of the suddenness thereof or some disability, [so that] the resulting direct and proximate damage causes a loss which is like or similar to losses arising from the causes specifically enumerated in section 165(c)(3). White v. Commissioner,48 T.C. 430, 435 (1967); see also Broido v. Commissioner,36 T.C. 786 (1961). Petitioner argues that his claimed casualty loss resulted from termite and water damage *83 to his house. Whether damage qualifies as a casualty has typically turned upon whether it satisfies the suddenness requirement for a casualty loss which -- denotes an accident, a mishap, some sudden invasion by a hostile agency; it excludes the progressive deterioration of property through a steadily operating cause. * * * [Emphasis added.] Fay v. Helvering,120 F.2d 253 (2d Cir. 1941), affg. 42 B.T.A. 206 (1940); Durden v. Commissioner,3 T.C. 1, 3 (1944). Furthermore, as stated in Farber v. Commissioner,57 T.C. 714, 718 (1972): An "other casualty" must also be unexpected, violent, and not due to the deliberate or willful actions of the taxpayer. John P. White,48 T.C. 430, 435 (1967). Moreover, this Court has held that a taxpayer's ordinary negligence will not be a bar to a casualty loss, although gross negligence would be. Harry Heyn,46 T.C. 302, 308 (1966); John P. White,supra at 435. [Fn. ref. omitted.] For example, in Fay v. Helvering,supra at 253, the Second Circuit affirmed our holding that there was *84 no casualty loss for termite damage discovered in 1935 in a home purchased in 1913. "The insects had obviously been at work for a long time, and the loss had therefore in fact taken place gradually although it was not discovered until it was complete." Whether termite damage qualifies as a "casualty" turns upon a factual determination of the "suddenness" of the loss itself, i.e., the lapse of time between the precipitating event and the loss proximately caused by that event. See Maher v. Commissioner,76 T.C. 593, 599-600 (1981), affd. 680 F.2d 91 (11th Cir. 1982). See also Hale v. Welch,38 F.Supp. 754 (D. Mass. 1941). In some situations where the damage occurred within a relatively short period of time, some 3 to 14 months, a casualty loss claim has been sustained. Rosenberg v. Commissioner,198 F.2d 46 (8th Cir. 1952), revg. 16 T.C. 1360 (1951); Buist v. United States,164 F. Supp. 218 (E.D.S.C. 1958); Kilroe v. Commissioner,32 T.C. 1304 (1959). However, where the *85 damage has been found to have been ongoing for several years prior to discovery, the loss has been denied. Dodge v. Commissioner,25 T.C. 1022 (1956); United States v. Rogers,120 F.2d 244 (9th Cir. 1941); Fay v. Helvering,supra;Feinstein v. United States,173 F. Supp. 893 (E.D. Mo. 1954). See Dodge v. Commissioner,supra, for a detailed analysis of these cases. It is thus seen that the weight of authority is to the effect that, generally, termite damage does not give rise to a deductible casualty loss. This is for the reason that it does not occur suddenly, unexpectedly, or from an unusual cause; it is rather in the nature of a gradual erosion or deterioration of property. * * * Only in exceptional cases where the invasion and measurable damage have occurred within a relatively short period of time has the loss been held deductible as a casualty loss. * * * [Dodge v. Commissioner,supra at 1026.] In this case petitioner discovered the termite damage in early *86 1976, some 14 to 16 months after the exit of the French drain was covered. Arguably, petitioner might fall within that line of cases which hold that such sudden termite damage is a casualty. However, it appears that petitioner, at best, incurred not one but two casualties, i.e., the two situations when his French drain was covered -- once in 1974 and again in 1979. Petitioner's testimony indicates that once the drain was extended in November 1976, the area beneath his house dried out and no further termite or water damage occurred as a result of the drain being blocked for the first time. Assuming without deciding that the termite damage would have qualified for a casualty loss deduction, we conclude that petitioner could have determined the amount of his damage at some point prior to the second blocking of the drain in 1979. Generally, casualty losses are deductible in the year sustained. Even if petitioner was to fall within the exception to the general rule, thus entitling him to claim the deduction in the year in which the amount of the loss is determined, we hold that 1980 is not *87 the correct year in which to claim a loss for damage from the first "casualty." Kunsman v. Commissioner,49 T.C. 62 (1967). In light of petitioner's testimony, we reject petitioner's argument that his damage occurred over a 7-year period. Once the damage ended, its amount was ascertainable. Petitioner cannot wait indefinitely before deciding how much damage he sustained. Petitioner himself recognizes this principle, stating in his brief: By the very nature of the damage, the amount of the damage could not be determined accurately until the French drain functioned properly and the area under the house was returned to its normal state of dryness. We conclude petitioner could have determined this amount in late 1976 or early 1977 and absolutely prior to the 1979 incursion. Petitioner testified and presented evidence that the termite attack was caused by the excessive moisture which stood under his house for some 2 years prior to the drain being extended. In allowing deductions for other casualties, we draw a distinction between inevitable casualty damage and damage allowed to occur as a result thereof. White v. Commissioner,supra, *88 Faber v. Commissioner,supra.Petitioner's action following the second episode where his drain was covered more accurately reflects the actions a prudent person would take than do his actions following the first episode. We thus agree with respondent that the bulk of petitioner's damage resulted from progressive deterioration. Petitioner's damages resulted more from his inaction in allowing the water to stand beneath his house for 2 years than as a proximate result of the covering of the drain. Here, we have a petitioner who took deliberate action to construct a drain at a cost of approximately $3,000. We consider his failure for 2 years to open the drain to remove the water which the drain was intended to prevent from accumulating was within the realm of deliberate and willful negligence, making the loss nondeductible. White v. Commissioner,supra;Faber v. Commissioner,supra; Broido v. Commissioner,supra.Therefore, we hold no casualty loss deduction is allowable to petitioner with respect to the termite damage. Likewise we hold that no casualty loss is allowable for the moisture damage. *89 Damages resulting from prolonged exposure to water are not sufficiently sudden to qualify as a casualty loss. [2]United States v. Lattimore,353 F.2d 379 (9th Cir. 1965). Petitioner further testified that most of the damage occurred during the first episode but that he could not determine the amount of damage caused each time. If we were to assume that the second covering of the drain was a sufficiently sudden destructive *90 force as to qualify as a casualty, we find no basis for determining the amount, if any, of the loss. We have no value of the house before the second casualty. Under the circumstances, at best, the allowable loss would be limited to the cost to repair, if any, the damage to the house but not the cost to extend the drain. Section 1.165-7(a)(2)(ii), Income Tax Regs.[3] Petitioner testified that of the $400 expended after the claimed second "casualty," the cost of uncovering the drain itself was minimal. Petitioner, however, did not testify for what the balance of the $400 was expended and provided no breakdown of the various cost items. If it was expended to extend the drain, the expenditure is for an improvement and not a repair. On this record we hold petitioner is not entitled to a casualty loss deduction for his 1979 drain covering repair costs, if any, for which he was not compensated. *91 Based on our conclusions that petitioner's termite and water damage was not the result of an "other casualty" and that petitioner may not deduct any costs for the claimed second "casualty," [4] we do not address petitioner's other arguments. Decision will be entered for the respondent.
Footnotes
1. All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. In Scott v. Commissioner,T.C. Memo. 1956-274↩, the taxpayer sought a casualty loss deductions in 1951 and 1952 for damages resulting from a storm in 1951. The Court allowed the 1951 but not the 1952 losses. The Court noted that casualty losses are for sudden, unexpected losses not from the gradual deterioration to property whether already damaged or not. "There [was] no showing that there was a direct connection between the storm and any subsequent damage sustained in 1952." Likewise in this case, while damage did result, it was not the direct result of covering the drain but from petitioner's deliberately and willfully allowing the water to stand under his house.
3. Sec. 1.165-7(a)(2)(ii), Income Tax Regs., provides as follows: (2) Method of valuation. (i) * * * (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d)↩ the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.
4. Since the city extended his drain in October 1976, petitioner received some compensation for the first claimed casualty.↩